38 F.3d 133
 The COLONIAL WILLIAMSBURG FOUNDATION, a Virginia non-stock
corporation, Plaintiff-Appellee,
v.
The KITTINGER COMPANY, a North Carolina corporation;
Michael P. Carlow; Nicholas J. Defino,
Defendants-Appellants,
and
Ladd Furniture, Inc.; Maytag Corporation, Defendants.
 No. 92-1925.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 8, 1993.
Decided Oct. 24, 1994.
 
 ARGUED: Robert F. Wagner, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, for appellants. George H. Gromel, Jr., Hunton & Williams, Richmond, VA, for appellee. ON BRIEF: Steven B. Larchuk, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, Alexander H. Slaughter, McGuire, Woods, Battle & Boothe, Richmond, VA, for appellants. Douglas W. Kenyon, Hunton & Williams, Raleigh, NC, for appellee.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Judge DONALD RUSSELL and Judge K.K. HALL concurred.
 OPINION
 WIDENER, Circuit Judge:
 
 
 1
 Michael P. Carlow, Chairman of the Board of Kittinger Company, appeals the decision of the district court holding him in civil contempt. Kittinger, Carlow, and Nicholas J. Defino, President of Kittinger, appeal the district court's decision enjoining Kittinger from manufacturing its HK furniture line and the district court's award of attorneys' fees, costs, and expenses.[1] Finding no error, we affirm.
 
 
 2
 For more than fifty years the Colonial Williamsburg Foundation and Kittinger did business together. See Colonial Williamsburg Foundation v. Kittinger Co., 792 F.Supp. 1397, 1400 (E.D.Va.1992).[2] Pursuant to a licensing agreement, Kittinger manufactured and sold antique furniture reproductions and adaptations that Kittinger designed in collaboration with Colonial Williamsburg from original pieces in Colonial Williamsburg's collection. See Kittinger, 792 F.Supp. at 1399-1400. On February 26, 1990, Colonial Williamsburg terminated the licensing agreement because it feared that frequent ownership changes and financial hard times would necessitate Kittinger's closing. See 792 F.Supp. at 1400.
 
 
 3
 In June 1990 Carlow acquired control of Kittinger and tried to negotiate a continuation of the licensing agreement, but Colonial Williamsburg had already entered into a licensing agreement with another company. See 792 F.Supp. at 1400. Consequently, in late 1990, Kittinger filed a declaratory judgment action in the United States District Court for the Western District of New York, seeking to have both certain provisions of the licensing agreement and certain trademarks of Colonial Williamsburg declared unenforceable. See 792 F.Supp. at 1400. On January 25, 1991, Colonial Williamsburg filed the instant case in the United States District Court for the Eastern District of Virginia, alleging breach of contract, federal trademark infringement, false designation of origin, and related Virginia statutory and common law violations. See 792 F.Supp. at 1400. On February 19, 1991, Colonial Williamsburg and Kittinger entered into a settlement agreement that provided for the dismissal of Kittinger's declaratory judgment action in the Western District of New York and the entry of a consent judgment in Colonial Williamsburg's suit in this case in the Eastern District of Virginia.[3] See 792 F.Supp. at 1400. Pursuant to the settlement agreement, the district court for the Eastern District of Virginia entered the consent judgment on February 25, 1991. See 792 F.Supp. at 1400.
 
 
 4
 On April 30, 1991, Defino, then Kittinger's Vice-President of Operations, filed an affidavit with the district court stating that Kittinger had complied with the consent judgment. See 792 F.Supp. at 1400, 1402. On February 5, 1992, Colonial Williamsburg filed a motion requesting both an order to show cause why Kittinger, Carlow, and Defino should not be held in contempt for violating the consent judgment and an order requesting certain discovery proceedings. See 792 F.Supp. at 1402. After the district court entered both orders, various events occurred resulting in, among other things, the seizure and impounding of certain materials retained by Kittinger, a motion for sanctions against defendants for violating the discovery order, and a continuation and consolidation of the hearings for show cause and sanctions. See 792 F.Supp. at 1402-03.
 
 
 5
 After hearing, the district court held Kittinger, Carlow, and Defino in civil contempt for violating both the consent judgment and the discovery order. See 792 F.Supp. at 1406. The district court then held each jointly and severally liable pursuant to the following sanctions: a disgorging of profits equal to one-third of the revenues generated from the sale of offending pieces; accrued interest from April 15, 1991 on unpaid royalties that were admittedly due and owing; reasonable attorneys' fees and costs to be determined by the parties or by petition to the court; the surrender of all offending products, regardless of their stage in production, and various paraphernalia, including papers, used in manufacturing, within forty-five days of the entry of the Final Order. See 792 F.Supp. at 1406, 1409-10. The district court also enjoined Kittinger from marketing or selling products derived from the offending pieces, plans, or drawings, required Kittinger to allow Colonial Williamsburg certain inspection rights four times per year for the next four years, and stated that the consent judgment would remain in effect to the extent its terms did not conflict with the Final Order. See 792 F.Supp. at 1410.
 
 
 6
 After the parties were unable to agree on reasonable attorneys' fees and costs, Colonial Williamsburg filed a motion requesting attorneys' fees of $308,511.75 and costs and expenses of $47,030.19. Defendants filed numerous specific objections to the fees, costs, and expenses and filed general objections claiming that they were unreasonable, improperly documented, and duplicitous and unnecessary. The defendants also filed a motion to amend or alter the judgment in several respects, and the district court stayed the execution of the Final Order until resolution of defendants' motion.
 
 
 7
 By Memorandum and Order entered July 1, 1992, the district court ordered that Kittinger be given control of the seized and impounded items and that it dispose of them in accordance with the Final Order, that Kittinger, at the request of Colonial Williamsburg, either surrender or destroy all drawings, files, and work-in-progress pieces, and that Kittinger retain certain seized and impounded items not affected by the consent judgment. The district court also prohibited Colonial Williamsburg from selling any finished goods that were not destroyed and ordered it to keep confidential all information obtained from Kittinger. By Memorandum and Order entered July 6, 1992, the district court awarded Colonial Williamsburg modified attorneys' fees, costs, and expenses in the amount of $361,627.01.[4] Defendants now appeal.
 
 
 8
 Carlow claims that the district court, based on its own findings of fact, abused its discretion in holding him in civil contempt for violations of the consent judgment. He claims that the district court made no specific findings of misconduct with regard to him and premised its finding of contempt on the fact that he, as President of Kittinger, had not done enough to guarantee compliance with the consent judgment. Because Carlow had delegated day-to-day management authority to Defino, he claims that he cannot be strictly or vicariously liable for the direct violations of Defino.
 
 
 9
 Because it is uncontested that Carlow knew of the consent judgment and discovery order; that the consent judgment and discovery order were in favor of Colonial Williamsburg; and that the violations caused Colonial Williamsburg harm, the only issue with regard to Carlow is whether the facts show that by his conduct he "violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations...." See Omega World Travel, Inc. v. Omega Travel, Inc., 710 F.Supp. 169, 170 (E.D. Va.1989) (stating four factors necessary for finding of contempt), aff'd by unpublished op., 905 F.2d 1530 (4th Cir.1990). Based on Carlow's deposition testimony that he did not read the consent judgment and Defino's deposition testimony that Carlow never discussed the consent judgment with him, the district court found that "no responsible person in the hierarchy of Kittinger made any effort to see that the terms and requirements of the Consent Judgment were disseminated to the employees of Kittinger in a manner that would alert them to their legal obligations thereunder." Kittinger, 792 F.Supp. at 1403. The district court further found that Carlow signed a letter sent to Kittinger's customers directly referencing Kittinger's past relationship with Colonial Williamsburg and that his actions were "deliberate, willful, and in bad faith." 792 F.Supp. at 1404-05. Based on these findings the district court stated:
 
 
 10
 The imposition of joint and several liability on Carlow is justified under the facts of this case.... Further, the case law establishes that an individual who is responsible for ensuring that a corporation complies with a court order cannot escape liability merely by removing himself from the day to day operations of the corporation and washing his hands of responsibility. In the instant case, the evidence is clear that Carlow took none of the affirmative steps necessary to ensure Kittinger's compliance with the Consent Judgment. Carlow's total dereliction of responsibility cannot be countenanced by this Court.
 
 
 11
 792 F.Supp. at 1406-07 (citations omitted).
 
 
 12
 In contesting the finding of contempt, Carlow attempts to distinguish the case law relied upon by the district court, namely Wilson v. United States, 221 U.S. 361, 376, 31 S.Ct. 538, 542-43, 55 L.Ed. 771 (1911), Connolly v. J.T. Ventures, 851 F.2d 930, 934-35 (7th Cir.1988), and NLRB v. Maine Caterers, Inc., 732 F.2d 689, 691 (1st Cir.1984). See Kittinger, 792 F.Supp. at 1406-07. He states that the officers in these cases were directly responsible for the violations and that in this case the district court found that only Defino was directly responsible for the violations of the consent judgment. See 792 F.Supp. at 1407. We are not persuaded by Carlow's arguments. As quoted by the district court, Wilson states:
 
 
 13
 A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.
 
 
 14
 Wilson, 221 U.S. at 376, 31 S.Ct. at 543. In this case, the district court found that Carlow did not take appropriate action within his power to ensure compliance with the consent decree. This is supported by the uncontested fact that Carlow neither read the consent judgment nor discussed it with Defino.
 
 
 15
 Though not extensive, we are of opinion that the findings with regard to Carlow support the contempt order. As President of Kittinger, Carlow was charged with the responsibility of ensuring that Kittinger complied with the consent judgment, and he did nothing to ensure compliance. While he couches his inaction as a proper delegation of authority to Defino, we are of opinion that his actions evidence a studied disregard of a court order and that the district court did not abuse its discretion in holding him in contempt.
 
 
 16
 Defendants next claim that the district court erred in holding that Kittinger's HK furniture line violated the consent judgment. They argue that the consent judgment allowed Kittinger to manufacture furniture from the inventory of parts that it previously used to make Colonial Williamsburg furniture, that multiple manufacturers make similar furniture, that consumers rely on labeling to determine the origin of furniture, and that Kittinger accurately and distinctively labeled its HK furniture. In making this argument the defendants seek to play down the fact that they retained Colonial Williamsburg's plans and drawings in direct violation of the consent judgment. In reaching its decision and awarding sanctions, the district court relied heavily on this fact. See 792 F.Supp. at 1408-10 (noting that Kittinger unlawfully retained plans and drawings in ordering disgorging of profits, surrender of HK products and injunction against marketing and sale of certain HK products).
 
 
 17
 Despite defendants' arguments to the contrary, we are of opinion that the relief granted was appropriate. Both the retention of these plans and drawings and the subsequent denial of their retention show deliberate violations of the consent judgment. Although the consent judgment allowed Kittinger to retain the inventory of parts formerly used to make Colonial Williamsburg furniture, it also stated that this inventory was to be used in the manufacture of products generally and that Kittinger had the affirmative obligation to modify it to ensure compliance with the consent judgment. Defendants, however, used this inventory to manufacture furniture illegally designed from the retained plans and drawings. This is a direct violation of the very consent judgment provision that defendants cite in their behalf. Furthermore, the fact that Kittinger may have labeled the furniture so as to indicate that it was not Colonial Williamsburg furniture, the fact that consumers may rely on such labeling, and the fact that other manufacturers make similar furniture does not relieve Kittinger of its liability for designing and manufacturing the furniture in direct violation of the consent judgment.
 
 
 18
 With regard to this last issue, defendants also claim that the district court erred in finding Kittinger's furniture to be confusingly similar and apt to mislead consumers, see Kittinger, 792 F.Supp. at 1408, because Kittinger's labeling of it effectively eliminated any confusion. By their very argument, defendants admit that the pieces are visually similar, and while effective labeling is a defense to visual similarity in some instances, we are of opinion that it is not a defense in this instance. First, the consent judgment specifically states that Kittinger is enjoined from manufacturing and selling products "so similar in appearance to the Licensed Products as to be likely to cause confusion, or to cause mistake, or to deceive the relevant consuming public...." Second, Kittinger cannot avoid liability for directly violating the consent decree simply by so labeling the resulting products which were "apt to mislead and confuse consumers as to their origin and/or connection with Colonial Williamsburg" as the district court found. 792 F.Supp. at 1408.
 
 
 19
 The final issue raised by defendants concerns the amount of attorneys' fees, costs, and expenses awarded to the plaintiffs. While this issue is one on which this circuit has forcefully and clearly expressed itself, see Fair Housing Council v. Landow, 999 F.2d 92 (4th Cir.1993) (reversing nominal award of attorneys' fees and completely denying any award due to the excessive amount of fees requested), we are of opinion that the district court did not abuse its discretion in awarding $361,067.01 in attorneys' fees, costs, and expenses in this case. See Tousley v. North Amer. Van Lines, 752 F.2d 96, 105 (4th Cir.1985). It is well settled that district courts have considerable discretion in awarding attorneys' fees, see Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), and we must not overturn an award by the district court unless it is clearly wrong. See Spell v. McDaniel, 824 F.2d 1380, 1401 (4th Cir.1987), cert. denied, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). In awarding attorneys' fees, the district court should first focus on the time and labor expended and the customary fees for like work. See Anderson v. Morris, 658 F.2d 246, 249 (4th Cir.1981) (applying twelve factors enunciated in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir.1974) and adopted by Fourth Circuit in Barber v. Kimbrell's Inc., 577 F.2d 216, 226 n. 28 (4th Cir.), cert. denied, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978)). After determining the initial fee, the district court should consider whether to adjust the fee on the basis of other factors, briefly explaining any adjustment. See Anderson, 658 F.2d at 249.
 
 
 20
 In this instance the district court, based on its review of the petition and supporting documentation, determined that the hourly rates were "reasonable and in line with the prevailing rates and disbursements by similarly experienced and skilled attorneys in similar cases." The district court then determined that the number of hours expended, with certain noted exceptions, were "reasonable and justified by the magnitude and complexity of the case, the defendants' deliberate, systematic, and pervasive violations of the Court's Orders, and the defendants' attempts to impede the plaintiff's discovery." Next, the district court disallowed all fees and expenses incurred prior to July 1991 because this work was envisioned by the consent judgment and did not arise from plaintiff's attempts to enforce its rights under the consent judgment. The district court also disallowed a portion of the attorneys' fees in preparing the motion for the show cause hearing and the brief in support thereof. Deeming the hours spent to be excessive, the district court reduced the requested fees by 20%.
 
 
 21
 The fact that the district court found the hourly billing rates and the hours expended to be reasonable and then adjusted the fees and expenses for various factors indicates that the district court analyzed the reasonableness of the fees requested. See Brubaker v. City of Richmond, 943 F.2d 1363, 1387 (4th Cir.1991). Although the district court did not specifically address all of the factors enunciated in Barber, we are of opinion that it adequately addressed the petition for fees.
 
 
 22
 We now turn to six specific objections raised by defendants. Defendants first claim that the use of Douglas W. Kenyon, a partner in the plaintiff's Raleigh office, necessitated numerous unnecessary and improper charges related to his travel to and from Richmond and for extra charges for telecopying, long distance, couriers and photocopying. We find no merit to this objection. An affidavit filed in support of the petition for fees before the district court showed that Kenyon had been Colonial Williamsburg's intellectual property lawyer for almost ten years and had drafted the last licensing agreement between Colonial Williamsburg and Kittinger. Based upon this, we are of opinion that the use of Kenyon was proper under the circumstances and that it was not an abuse of discretion for the district court to allow full recovery of his fees and expenses.
 
 
 23
 Defendants next assert that the staffing of four partners on the case constituted poor billing judgment because it resulted in numerous instances where the same task was being performed by several people. We also find no merit to this objection. The staffing of four partners does not alone constitute poor billing judgment, and in this instance we note that two partners actually performed most of the work. (Gromel 403.5 hrs., Kenyon, 678.75 hrs.) Of the two remaining partners, one billed only ten hours and the other billed over one-third of his time in March, 1992 when the main partners were occupied with seizing evidence from Kittinger per a court order and taking numerous court-ordered depositions. So we do not believe the use of the four partners in the situation which existed was unreasonable.
 
 
 24
 Defendants' third objection claims that assigning two partners to attend several depositions was unnecessary. Again we find no merit to this objection. The district court's discovery order stated that Kittinger must pay for the travel and lodging for two attorneys and an expert to attend the depositions in question. We do not think the district court abused its discretion in its approval of two partners.
 
 
 25
 Defendants' fourth objection asserts that plaintiff's counsel "authorized the conduct of legal research and the preparation of legal memoranda and related conferences for a variety of legal matters and a variety of theories that had no application to the relevant issues and did not play a part in the ultimate outcome of the hearing." No factual support for this point is argued in the brief, but the defendants refer to the objection made in the district court. The plaintiff, in response, denies the allegation and refers to its response in the district court. The district court accepted the plaintiff's position without detailed explanation, and so do we.
 
 
 26
 The fifth objection asserts that the petition included fees and costs for other clients, unnecessary entries and entries with no description. As with the fourth objection, it is unsupported in fact except by reference to objections made in the district court, and there was similar response by the plaintiff. As with the last objection, the district court accepted plaintiff's position without detailed explanation, and so do we.
 
 
 27
 The last objection is that the plaintiff claimed fees and expenses for the period commencing March 31, 1991 through December, 1991 for follow-up work and work unrelated to the motion for contempt filed in February, 1992. The district court, in fact, reduced the claimed fees by $10,236.50 and expenses by $1,739.29, for fees and expenses claimed for work prior to July, 1991. These are the exact and precise figures taken from the defendants' objection filed in the district court, and since the defendants have had a part of their objection sustained and do not point out how the district court's choosing the July date was clearly erroneous, we are at a loss to know what the objection is. In all events, we find the objection to be without merit.
 
 
 28
 The orders of the district court appealed from are accordingly
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 Kittinger and Defino also have appealed from each adverse ruling in the orders complained of, but their appeals from the finding of contempt are not emphasized as is that of Carlow. In all events, all of the contempt findings are affirmed
 
 
 [2]
 The principal opinion of the district court was filed on May 20, 1992 and is reported in 792 F.Supp. at 1397. Two other brief opinions were filed July 1, 1992 and July 6, 1992. This appeal is from the three orders of even dates with the opinions
 
 
 [3]
 While the consent judgment is 12 pages in length, without attempting to abstract any considerable number of its terms, it provided that Kittinger would get out of the furniture business in which it had previously been engaged with Colonial Williamsburg. Among many other things, the consent judgment provided that Kittinger was enjoined from the direct or indirect use of any of the marks and names of Colonial Williamsburg or a colorable imitation thereof, and was also enjoined from manufacturing or selling the Colonial Williamsburg products or any products so similar in appearance as to be likely to cause confusion or mistake or to deceive the public into thinking that Kittinger products were the licensed products of Colonial Williamsburg
 
 
 [4]
 The original motion for attorneys' fees, expenses, and costs requested $355,541.94. Colonial Williamsburg filed a supplemental motion seeking $26,030 in attorney's fees and $3,644.53 for work conducted and expenses since the filing of the original fee petition. In response to specific objections, Colonial Williamsburg voluntarily deducted $3,828.67 in disbursements. The district court then reduced the petition by $1,739.29 in disbursements and $10,236.50 in attorneys' fees incurred prior to July 1991. The district court also reduced the attorneys' fees for preparing the motion for show cause and the legal brief in support thereof by 20%, or $7,785, finding them to be unreasonable